The Union Central            1876 Waycross Road
Life Insurance Company       PO Box 40888
                             Cincinnati, Ohio 45240
                             (513) 595 2200

# UnionCentral

Insurance and Investments



DEPOSITION
EXHIBIT
Deppen 6
TW    2/10/03

NOVEMBER 13, 2000

NORBERT VADUS
PO BOX 2624
WICKENBURG AZ 85358

Mrs. Jones:

Enclosed is the check you requested. If you have any further questions please do not hesitiate to call me at 1-800-825-1551 ext 2376.

I have a favor to ask of you. Next month is my yearly review and one thing that really stands out to management is to have our clients acknowledge our service. Would you mind writing a short memo stating I am doing my job, providing accurate information or processing your request in a timely and professional manner, etc. Thank you in advance.

Sincerely,

Donna Scott
Client Service Rep

P.S. Please throw this letter away - Thanks!



EXHIBIT

A

UNION CENTRAL - 0219

Securities products offered through registered representative of Carillon Investments, Inc., a subsidiary of Union Central Life Insurance Company, P.O. Box 40409

Union Central
Life Insurance Company    226 Waycross Road
PO Box 40888
Cincinnati, Ohio 45240
(513) 595 2200



Insurance and Investments

August 16, 1999

RUBY F. TURNER
PO BOX 1753
FRITCH TX 79036

Mrs. Turner:

I received your fax on Friday 8/13/99 and started your withdraw.. Hopefully this will enable you to conduct your business on time.

I have a favor to ask of you. I have a review coming up and one thing that really stands out to management is to have our clients acknowledge our service. If you would just jot down a few lines saying I am doing my job or providing accurate information in a professional manner, etc. Thank you in advance.

Sincerely,

Donna Scott
Client Service Rep

P.S. Please throw this letter away - Thanks!

UNION CENTRAL - 0220

Securities products offered through registered representatives of Carillon Investments, Inc., a subsidiary of The Union Central Life Insurance Company, P.O. Box 40409.

FOR THE RECORD

THE UNION CENTRAL LIFE INSURANCE COMPANY

DEPOSITION EXHIBIT
Deppen 8
PENGAD 800-631-6989
T. W.    2/10/03

NAME:            Donna Scott

DATE:            February 5, 2001

DIVISION:        Annuity

DEPARTMENT:      ILCS

REASON:

Service complaints, inappropriate action regarding client letters.

## NARRATIVE SUMMARY:

Several complaints have been received regarding:
1. External complaints about Donna's lack of timely responsiveness to telephone messages.
2. Internal complaints about Donna's reluctance to answer the zero line.
3. External complaints that no matter what time of day or how frequently agency associates call, she rarely, if ever, answers the phone and as a result, they are too often forced to leave messages or go to another associate for assistance.
4. A recent situation developed where Donna set aside a problem situation for three weeks, upsetting both the client and agent.

The Division phone reports substantiate Donna's reluctance to assume responsibility for telephone coverage. A copy of this summary is attached.

Donna has been sending letters to clients soliciting positive feedback. She claims to have interpreted that comments made by a senior officer led her to believe that this was an acceptable practice, it is not. The letters were deceptive and dishonest with respect to the timing of her performance evaluation (see letter attached). Donna submitted responses to her letters for service award recognition that unfairly gave her an advantage over her coworkers for departmental prize drawings. The inappropriateness of the letters seems to have been recognized by Donna by virtue of her request for clients to dispose of her letter after receipt.

The solicitation of feedback via letters to clients needs to cease immediately.

## EMPLOYEE COMMENTS:

*I have provided a letter dated February 5th, 2001 to Rick Pretty and Connie Retherford outlining my reasons why the information contained in the above narrative summary are inaccurate, distorted and mis-leading and are part of a continuing pattern of discriminatory harassment towards me by my supervisor Becky Deppen. I have also requested a meeting with Rick Pretty and Connie Retherford to provide detailed information on this and to provide information on the discriminatory harassment that I have been forced to endure.*

EXHIBIT
B

UNION CENTRAL - 0

ACTION TO BE TAKEN

Donna will no longer be a Client Service Representative. She will be assigned to the position of balancing and monitoring errors in the Fund System. She needs to make documented measurable progress in the clean up and maintenance of these items. A job description will be developed and provided to her outlining responsibilities and reporting requirements.

DATE TO BE REVIEWED:  February 1, 2001

_____          _____
Employee's Signature                                         3/6/01
                                                                    Date

_____          _____
Manager's Signature                                          3/7/01
                                                                    Date

_____          _____
Human Resources Representative                      3/7/01
                                                                    Date

*My signature on the above" action to be taken" is to acknowledge my receipt and review of the information contained and in no way indicates that I agree with the information in the narrative summary or in the recommendation for the action to be taken. It is in fact, unfair and part of a continuing pattern of discriminatory harassment towards me by my supervisor Becky Deppen that needs to be investigated as a violation of existing company policy against this discriminatory harassment.*

UC 900 9-86

UNION CENTRAL - 0129

# Inter-Office Memorandum

The Union Central
Life Insurance Company
Cincinnati, Ohio

## UnionCentral



DEPOSITION EXHIBIT
Retherford 7

| TO: | Rick Pretty | FROM: | Connie Retherford |
|---|---|---|---|
| | | | Human Resources |
| RE: | Annuity Interviews | EXT: | 2507 |
| | | DATE: | April 10, 2001 |

Donna Scott requested an investigation of the Annuity Division. Donna feels that she is being harassed by her manager, Becky Deppen. Donna feels that we have discriminated against her based upon the "For the Record". She feels others in the department with the same performance issues have just been given verbal warnings and she deserves the same treatment. Becky has documented that she has spoken to Donna on numerous occassions regarding issues addressed in the "For the Record." The one exception would be the letter Donna wrote to a client. The letter contained information that was dishonest and in general the request for recognition in this manner does not represent the appropriate behavior of a Client Service Representative.

I have interviewed all regular employees in the Annuity Division. I have attached a copy of the annonymous responses of every individual in this area. Employees did have concerns over some of the same issues that Donna has brought to my attention. The main concern of a majority of the employees is Dan Woodard's behavior. They feel his promotion to supervisor was not appropriate. They have issues with his behavior involving Penny. They also have issues of him never being around when they need him and his constant abuse of personal phone calls.

Some individuals were also concerned with Jeremy Whiting. They feel he should not have been given the opportunity to take the exam the fourth time. We did not terminate any in the past for failing the Series 6 exam so I cannot say that I agree that we have been unfair.

There are issues with Donna Anderson and her negative attitude. Employees feel that Becky does show favortism to Donna Anderson because whenever she complains, Becky takes action. They also believe that Donna A. has threatened to leave the division and Becky has given her a pay increase.

Some people feel Becky shows favortism to Kim Redden. They feel Kim can be very loud and rude and Becky ignores this behavior.

Donna Scott accused Becky of asking her employees to lie. I did ask each employee if any member of management had ever asked them to lie. The majority of the responses were "no". There were situations where they had been asked not to disclose problems that were related to the system. Becky had asked them not to blame problems on the system. Her concern is that she does not want policy holders to feel we have an inadequate system.

Donna Scott and Donna Anderson have both brought up the issue of the inequity of salaries. I am concerned that we have continued to give the previous team leaders salary increases without reducing their salaries when they were removed from the team leader role.

**EXHIBIT**

C

UNION CENTRAL - 0507

Many individuals in the Annuity area feel the Key Award Program is abused by Donna Anderson and Donna Scott.

I do not feel Becky has singled Donna Scott out; the main reason Becky prepared the "For the Record" is because of the letter that Donna sent to a policyholder requesting recognition. When I asked if anyone had ever requested a letter or felt that Rick had given them permission to do so. No one felt that Rick ever intended on anyone soliciting this type of recognition. I still feel behavior does not represent the behavior of someone representing the Company.

UNION CENTRAL - 0508

 

**lexisONE**®
The Resource for Small Law Firms

Logout

Customer Support  |  Your Account & Subscriptions

LexisNexis™ Research
for Small Firms

Forms

LexisNexis™ Bookstore

Headline Legal News

Balancing Life and Practice

New Attorneys

Legal Web Site Directory

LexisNexis™ CLE Center

# Free Case Law

## Case Law Full Display

**Source:** 6th Circuit Court of Appeals

**Search Terms:** jones w/10 packard

**Viewing:1 of 1 Results**
Previous | Next
Return to Search Results ▸▸
Compose a New Search ▸▸





2000 U.S. App. LEXIS 4153,*

INEZ JONES, Plaintiff-Appellant v. DELPHI PACKARD ELEC. SYS., Defendant-Appellee

No. 99-3294

UNITED STATES COURT OF APPEALS FOR THE SIXTH CIRCUIT

2000 U.S. App. LEXIS 4153

March 13, 2000, Filed

**NOTICE:**  [*1]  NOT RECOMMENDED FOR FULL-TEXT PUBLICATION. SIXTH CIRCUIT RULE 28(g) LIMITS CITATION TO SPECIFIC SITUATIONS. PLEASE SEE RULE 28(g) BEFORE CITING IN A PROCEEDING IN A COURT IN THE SIXTH CIRCUIT. IF CITED, A COPY MUST BE SERVED ON OTHER PARTIES AND THE COURT. THIS NOTICE IS TO BE PROMINENTLY DISPLAYED IF THIS DECISION IS REPRODUCED.

**SUBSEQUENT HISTORY:**  Reported in Table Case Format at: 2000 U.S. App. LEXIS 10536.

**PRIOR HISTORY:**  ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF OHIO EASTERN DIVISION. 96-01311. Thomas (M). 2-2-99.

**DISPOSITION:**  AFFIRMED.

**COUNSEL:**  For INEZ JONES, Plaintiff - Appellant: Jeffrey V. Goodman, Maridee L. Costanzo, Warren, OH.

For DELPHI PACKARD ELECTRIC SYSTEMS, Defendant - Appellee: Edward L. Lavelle, Letson, Griffith, Woodall, Lavelle & Rosenberg, Warren, OH.

**EXHIBIT**

D

**JUDGES:**  BEFORE: MERRITT, NELSON, and DAUGHTREY, Circuit Judges.

**OPINIONBY:**  Merritt

**OPINION:  Merritt, Circuit Judge.** Plaintiff Inez Jones, an African-American female, alleges racial and sex discrimination when Delphi Packard Electric Systems demoted plaintiff from her position as a shift supervisor because of her poor attendance record and for misstating her hours worked. She also makes the same discrimination complaint as a result of the fact that Packard failed to promote her to the position [*2] of day-turn supervisor when she applied for that position. Granting summary judgment for defendant Packard, the district court found that plaintiff failed to meet the prima facie case for racial discrimination by failing to show that plaintiff was otherwise qualified for her then current position as an afternoon shift supervisor or for the position of day-turn supervisor. The court also found that plaintiff failed to show that she was treated any differently than any other employee outside her protected class when she was demoted, and plaintiff failed to show that was treated any differently than other similarly qualified supervisors at the time of the opening of the day-turn position. The district court found that plaintiff abandoned her sex discrimination claim. We affirm the judgment of the district court on the racial discrimination claim and for different reasons than the district court affirm the judgment on the sex discrimination claim as well.

### I. Plaintiff failed to establish a prima facie case of race or sex discrimination when she was demoted from her position as an afternoon shift supervisor.

In a race or sex discrimination suit involving an adverse action such [*3] as a demotion, the plaintiff must demonstrate four prima facie elements: (1) the plaintiff was a member of a protected class; (2) the plaintiff was subject to an adverse employment action; (3) the plaintiff was qualified for the job; and (4) the plaintiff was treated differently than employees outside the protected class for the same or similar conduct. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 36 L. Ed. 2d 668, 93 S. Ct. 1817 (1973); *Mitchell v. Toledo Hospital*, 964 F.2d 577, 582 (6th Cir. 1992) (adapting *McDonnell Douglas* to a discharge/demotion situation). Plaintiff in this case failed to demonstrate that she was qualified for her position as afternoon shift supervisor and failed to show that she was treated any differently than employees outside her protected class for the same misconduct.

Plaintiff Jones did not present evidence that she was qualified for the position of an afternoon shift supervisor, the job from which she was demoted. To establish that she was qualified for her afternoon shift supervisor position, Plaintiff was required to show that she was performing her job to her employer's satisfaction. *See Ang v. Procter & Gamble Corp.*, 932 F.2d

540, 549 (6th Cir. 1991); [*4] *McDonald v. Union Camp Corp.*, 898 F.2d 1155, 1160 (6th Cir. 1990). This circuit in *Ang v. Procter & Gamble Corp.*, 932 F.2d at 548-49, explained:In order to show that he was qualified, [plaintiff] must prove that he was performing his job "at a level which met his employer's legitimate expectations." *Huhn v. Koehring*, 718 F.2d 239, 243 (7th Cir.1983). Moreover, "if [plaintiff] was not doing what his employer wanted him to do, he was not doing his job... [Plaintiff] does not raise a material issue of fact on the question of the quality of his work merely by challenging the judgment of his supervisors." *Kephart v. Institute of Gas Technology*, 630 F.2d 1217, 1223 (7th Cir.1980), *cert. denied*, 450 U.S. 959, 101 S. Ct. 1418, 67 L. Ed. 2d 383 (1981). In this case, [plaintiff] does not dispute, but in fact acknowledges that his supervisors were dissatisfied with his job performance in the summer of 1986 when he was discharged. Instead [plaintiff] argues that Union Camp made too big a deal out of his alleged "people problems." However, the aim is not to review bad business decisions, or question [*5] the soundness of an employer's judgment. *See Wilkens [Wilkins] v. Eaton Corp.*, 790 F.2d 515, 521 (6th Cir.1986). [Plaintiff] was simply not performing to Union Camp's satisfaction.It is clear in this case that Jones failed to show that she was performing her job to her employer's satisfaction due to her repeated absences from work. Jones was already on probationary status due to her poor attendance record. (Jones Dep., Def.'s Ex. B; J.A. at 329.) After receiving renewed complaints of Jones' absences, her supervisor, Gus Aivasis, decided to investigate the turnstile and time clock records from November 1994 into the first few months of 1995. (Aivasis Aff. P 11; J.A. at 59.) The investigation revealed that on six occasions, Jones left her work area without authorization of the general foreman. (Aivasis Aff. P 23; J.A. at 61.) On five of the unauthorized departures from work, Jones misstated her actual hours worked on her weekly time sheets. Jones does not dispute that she did indeed depart from work without informing the general foreman in each of those five occasions. (Jones Dep. at 72-74, 79-81; J.A. at 312-14, 319-21.) Instead, Jones disputes only one [*6] of the six instances of attendance violations, but for that instance, February 10, 1995, Aivaris was personally present in her work area for two and a half hours during her shift and could not locate her. Time clock records later verified that Jones had clocked in, but did not disclose her clock-out time. (Aivasis Aff., Ex. B at 16; J.A. at 79.) Based on the undisputed five unauthorized absences, her falsified weekly time sheets, and turnstile records, Packard demoted plaintiff. It is clear that plaintiff failed to meet Packard's reasonable expectations for her position as an afternoon supervisor.

Plaintiff Jones has also failed to present any evidence that she was treated any differently than employees outside of the protected class, i.e., that she was treated differently than similarly situated non-minority or male employees when she was demoted from her position as an afternoon supervisor. On the contrary, plaintiff's demotion was consistent with the

lexisONE(sm) Free Case Law
Page 4 of 5
Case 1:02-cv-00075-HJW     Document 27-2     Filed 09/08/2003     Page 10 of 22

discipline received by other non-black and male employees. From April 1992 - December 1994, defendant had discharged or demoted five salaried employees because of attendance problems or rules violations of which four were male, one [*7] was female, and none were black. Plaintiff did offer deposition testimony of another Packard employee, James Pugh, who testified in his opinion that plaintiff's demotion was severe punishment for an unauthorized absence from work, but Mr. Pugh, by his testimony, seemed unaware of plaintiff's five other unauthorized absences and the falsified records.

## II. Plaintiff failed to establish a prima facie case of race or sex discrimination when defendant refused to promote her to a day-turn supervisory position.

Just as in her discriminatory demotion allegation, Jones has the burden of establishing a prima facie case of race or sex discrimination for defendant's failure to promote. She must show that (1) she is a member of a protected class, (2) she applied for and was qualified for a job for which the employer was seeking applicants; (3) that, despite her qualifications, she was rejected for the job; and (4) that other employees of similar qualifications who were not members of the protected class were promoted at the time plaintiff's request for a promotion was denied. *See McDonnell Douglas Corp.*, 411 U.S. at 802; *Brown v. Tennessee*, 693 F.2d 600, 603 (6th Cir. 1982); [*8] *Abrams v. Johnson*, 534 F.2d 1226, 1230-31 (6th Cir. 1976) (adapting *McDonnell Douglas* to a failure to promote situation). We find that plaintiff has failed to create genuine issues of material fact as to her qualifications for the job, and showing that other non-protected, but similarly qualified employees were promoted at the time plaintiff's request for promotion was denied.

Upon review of the record, plaintiff has failed to present sufficient evidence to raise a genuine issue as to whether plaintiff was qualified for the position of day turn supervisor. During the period in which the day turn supervisory position became open, defendant had been investigating plaintiff's absences. The investigation revealed that plaintiff had been absence on a number of occasions and led to plaintiff's demotion. By virtue of her demotion, plaintiff was no longer qualified for the position as day turn supervisor. Last, plaintiff failed to show that a non-protected class member with a similar poor record of attendance received the promotion.

Based on the foregoing reasons, we find that plaintiff has failed to present sufficient evidence of any genuine issues of material fact [*9] of race or sex discrimination. The judgment of the district court is AFFIRMED.

**Viewing:1 of 1 Results**
Previous | Next
Return to Search Results ▸ ▸
Compose a New Search ▸ ▸
Back to Top ▸ ▸

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| DONNA SCOTT, | : | Case No. C-1-02-075 |
| | : | |
| Plaintiff, | : | Judge Herman J. Weber |
| | : | Magistrate Judge Timothy S. Hogan |
| v. | : | |
| | : | **DEFENDANT'S RESPONSE TO** |
| THE UNION CENTRAL LIFE | : | **PLAINTIFF'S FIRST SET OF** |
| INSURANCE COMPANY, | : | **INTERROGATORIES DIRECTED TO** |
| | : | **DEFENDANT** |
| Defendant. | : | |

Pursuant to Rules 33 and 34 of the Federal Rules of Civil Procedure, Defendant The Union Central Life Insurance Company provides the following Objections and Responses to Plaintiff's First Set of Interrogatories Directed to Defendant.

In response, Defendant makes the following general objections which are hereby incorporated into each answer and response to Plaintiff's First Set of Interrogatories Directed to Defendant.

## GENERAL OBJECTIONS

1.     Only relevant and discoverable information shall be provided.    Requested information will not be identified or produced if it exceeds the scope of discovery as set forth in Rule 26 of the Federal Rules of Civil Procedure.

2.     No attorney-client privilege or work product documents or information shall be produced.  To the extent that any privileged information is provided, it shall not constitute a waiver of the privilege as to any other information.

**EXHIBIT**

E

9.    Identify by name, address, phone number and field of expertise all expert witnesses who may or will be called by Defendant to testify at trial.

> **RESPONSE:**
> Defendant has not yet decided what witnesses it will call at trial.

10.    Identify any other individual who has alleged age and/or gender discrimination against Defendant from April 17, 1998 to April 17, 2002.

> **RESPONSE:**
> Defendant objects to this interrogatory on the basis that it is overbroad and not calculated to lead to the discovery of relevant evidence.

11.    a)    Identify the name, date of birth, and gender of all person(s) who have performed any of Plaintiff's job duties since April 17, 2001.

       b)    If Plaintiff's duties have not been performed since April 17, 2001, explain why such duties have not been performed.

> **RESPONSE:**
> Donna Anderson
> Female
> Age 57

12.    Identify the name, job title, date of birth, and gender of each employee terminated from Defendant from April 17, 2000, to April 17, 2002.

> **RESPONSE:**
> Defendant objects to this interrogatory on the basis that it is overbroad and not calculated to lead to the discovery of relevant evidence.





**Logout**

Customer Support | Your Account & Subscriptions

LexisNexis™ Research
for Small Firms

Forms

LexisNexis™ Bookstore

Headline Legal News

Balancing Life and Practice

New Attorneys

Legal Web Site Directory

LexisNexis™ CLE Center



# Free Case Law

## Case Law Full Display

**Source:** 6th Circuit Court of Appeals

**Search Terms:** legitimate w/7 discrim! w/25 valid

**Viewing:3 of 7 Results**
Previous | Next
Return to Search Results ▸▸
Compose a New Search ▸▸

Up

Shepar
citatior
$4.25 ▸

Get the
feature
this ca
▸▸

Run th
search
for $9.

**Tell m**
View a
these ▸
service

2000 U.S. App. LEXIS 2477,*

WARREN W. DAVID, Plaintiff-Appellant, Cross-Appellee, v. ANA TELEVISION NETWORK, INC., and ANA RADIO NETWORK INC., Defendants-Appellees, Cross-Appellants.

Nos. 98-2288/98-2289

UNITED STATES COURT OF APPEALS FOR THE SIXTH CIRCUIT

2000 U.S. App. LEXIS 2477

February 16, 2000, Filed

**NOTICE:**  [*1]  NOT RECOMMENDED FOR FULL-TEXT PUBLICATION. SIXTH CIRCUIT RULE 28(g) LIMITS CITATION TO SPECIFIC SITUATIONS. PLEASE SEE RULE 28(g) BEFORE CITING IN A PROCEEDING IN A COURT IN THE SIXTH CIRCUIT. IF CITED, A COPY MUST BE SERVED ON OTHER PARTIES AND THE COURT. THIS NOTICE IS TO BE PROMINENTLY DISPLAYED IF THIS DECISION IS REPRODUCED.

**SUBSEQUENT HISTORY:**   Reported in Table Case Format at: 2000 U.S. App. LEXIS 10408.

**PRIOR HISTORY:**   ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF MICHIGAN. 96-40129. Gadola. 9-30-98.

**DISPOSITION:**   District court's opinion AFFIRMED in part, REVERSED in part, and case REMANDED for entry of an order of remittitur on the issue of damages.

**COUNSEL:**  For WARREN W. DAVID, Plaintiff - Appellant, Cross-Appellee (98-2288, 98-2289): Kathleen L. Bogas, Sachs, Nunn, Kates, Kadushin, O'Hare, Helveston & Waldmar

LexisN
for Sm

lex

Your S
Resear
One D;

Exclusi
Membe
Case L
Codes:
One D;

Exclusi
Membe
State ;
Case L
Codes:
One D;

**EXHIBIT**

F

Elizabeth A. Cabot, Sachs, Waldman, O'Hare, Helveston, Bogas & McIntosh, Detroit, MI.

For ANA TELEVISION NETWORK, ANA RADIO NETWORK, INC., Defendants - Appellees, Cross-Appellants (98-2288, 98-2289): Eric J. Pelton, Kelli L. Kerbawy, Kienbaum, Opperwall, Hardy & Pelton, Birmingham, MI.

**JUDGES:**  BEFORE: NELSON and DAUGHTREY, Circuit Judges, and DOWD, District Judge. *
* The Hon. David D. Dowd, Jr., United States District Judge for the Northern District of Ohio, sitting by designation.  [*2]

**OPINION:   PER CURIAM**. The plaintiff, Warren David, filed suit against his former employers, defendants ANA Television Network, Inc., and ANA Radio Network, Inc., in Michigan state court, alleging violations of Michigan's Whistleblowers' Protection Act, M.C.L.A. §§ 15.361-15.369, national origin discrimination in violation of the Elliott-Larsen Civil Rights Act, M.C.L.A. §§ 37.2101-37.2804, retaliation for exercise of protected activities, breach of written contract, and breach of oral contract. The defendants removed the case to federal court where, prior to submitting the case to the jury, the district judge dismissed the whistleblower, discrimination, and retaliation claims as a matter of law. Trial on the remaining contract claims resulted in a jury verdict in the plaintiff's favor and an award of $ 51,794.61 in damages.

The plaintiff now appeals the district court's order dismissing the non-contract claims, and the defendants cross-appeal, alleging that the damages on the breach of written contract claim were excessive and cannot be supported by the evidence in the record. They contend, therefore, that the district court erred in denying their motion for a new trial on damages  [*3]  or, in the alternative, for remittitur. We conclude that the district court miscalculated the damages recoverable by the plaintiff, and we therefore find it necessary to remand the case for the entry of an order of remittitur. We affirm the judgment in all other respects.

## FACTUAL AND PROCEDURAL BACKGROUND

Warren David is an American citizen, born to parents who were also born in the United States. David's grandparents emigrated to this country from Syria and from Lebanon, however, explaining, in part, the plaintiff's interest in Arab-American matters. Eventually, David was able to combine his interest in his ethnic heritage with his fascination with broadcasting by accepting a position as director of sales and marketing for ANA Television Network, Inc., and ANA Radio Network, Inc., which target the estimated three million Arab-Americans living in the United States.

Although ANA never produced a profit for its parent corporation, Middle East Broadcasting Company of London,

David claimed that national sales figures at ANA increased during his tenure as sales and marketing director from approximately $ 400,000 per year to approximately $ 1,700,000 annually. (Another witness [*4] pegged the figure at no more than $ 800,000, however.) The plaintiff also claimed that his early employment with the corporation was marked with respect from and collaboration with David's superiors, Cindy Montalvo, an American-born African-American, and Bruce Findland, an American-born individual of Jewish heritage. In fact, David stated that he spoke with Findland, the company's president and chief executive officer, on a daily basis, although usually by telephone because David spent much of his time in Detroit, away from the Washington, D.C., offices occupied by Montalvo and Findland. The plaintiff also participated in weekly manager meetings, either by conference call or in-person in Washington, with Findland, Montalvo, Middle-Eastern-born managers Shamime Rassam, Abe Al-Masri, and Omar Shawish, and American-born distribution head Don Brownlee.

In May 1995, Findland and David agreed to terms on a restructured 18-month employment contract retroactive to June 6, 1994. Pursuant to that agreement, the plaintiff was to receive a $ 50,000 per year base salary from ANA and, additionally, a 2.5% override commission on gross advertising revenues. The contract also provided that if David [*5] left ANA, the company would pay him "commissions on all advertising revenues later received from any sales contracts entered into at any time prior to [his] separation date."

Much to the plaintiff's chagrin, Findland was replaced as president and chief executive officer of ANA by the end of the summer of 1995. In his stead, Middle East Broadcasting Company hired Mohamed Hakki, an Egyptian-born journalist who had worked in the World Bank, as official spokesperson for Egyptian presidents Anwar Sadat and Hosni Mubarek, and in various radio and television capacities. Although Hakki was cordial to David, the plaintiff noticed that the new president no longer included David in weekly meetings, returned his phone calls, or corresponded with him by memo as Findland had done. A more noticeable strain in the parties' relations appeared after a formal dinner in Washington in August 1995 attended by David, Hakki, and by Abdullah Masry, the head of Middle East Broadcasting Company. At one point during the gathering, David asked Dr. Masry where he had received his American graduate schooling. Hakki later explained that such an inquiry would be, and indeed was, perceived by Masry as an insult. [*6] Consequently, the remainder of the evening was filled with tension and Hakki himself was forced to apologize to Masry and accept the blame for the perceived slight.

Shortly thereafter, feeling that Hakki was not satisfied with the plaintiff's job performance, David cut short a family vacation in New England and traveled to Washington to meet with his superior. The ANA president characterized the ensuing

meeting as cordial, but did admit that he expressed concerns about the plaintiff's production. Hakki further remembered that David suggested the possibility of a move to the company's production department, a move Hakki would not have opposed if the plaintiff wished to do so. In fact, Hakki testified that he had already decided to change David's role with the company and that ANA would not renew David's employment contract on its existing terms when the contract expired in December.

The plaintiff offered a differing account of the meeting with Hakki. According to David, he told Hakki that he was not happy with his work situation because of the lack of communication between the two men. Although Hakki denied that any problem existed, David recounted that Hakki asked if the plaintiff [*7] would be "interested in the future in doing something in production." David responded that he would be happy to assist in another department but that he was still intent upon maintaining his position as national director of marketing and sales.

David left the meeting without a sense that his concerns had been resolved. Consequently, he discussed his situation with Cheryl Montalvo, who informed the plaintiff that Hakki was "preparing a memo to demote [David] to manager of the Detroit office. And to take the director of national . . . marketing and sales away from [him]." As a preemptive strike, the plaintiff then contacted his brother-in-law, an attorney, and approved a letter drafted by the lawyer and sent to Dr. Masry in London, with a copy to Hakki. In the correspondence, the attorney accused Hakki and the company of employment discrimination and of violations of Federal Communications Commission regulations. He also noted that he had prepared complaints and requests for investigation to numerous state and federal agencies, and that he would send those complaints unless ANA ceased its efforts to interfere with David's duties as national marketing and sales director.

After receipt [*8] of the letter from David's attorney, Hakki was "livid" and sent Montalvo to Detroit on September 25, 1995, to direct the plaintiff to vacate the company offices immediately. Furthermore, Montalvo changed the locks on those offices to prevent David's readmittance. Nevertheless, ANA did not consider the plaintiff's employment terminated at that point and stated, through its attorney, that it would consider allowing David back into his offices if he would cease his conduct deemed detrimental to the company. Hakki testified that he did not originally consider demoting David, but only shifting the focus of his responsibilities to production and to the Detroit area. After receipt of the letter from the plaintiff's attorney, however, the London headquarters of the company "felt that this whole business is bad news. That this is going to -- this person is going to create headaches. He's a loser. For God's sake forget about him. Let him go."

Feeling that the adverse employment circumstances resulted

from discrimination against American-born employees, David filed suit against ANA in state court, alleging not only employment discrimination, but also violations of the Michigan Whistleblowers' [*9] Protection Act, retaliation for challenging the alleged discrimination, and breach of oral and written contracts. After the matter was removed to federal court, the district judge dismissed the statutory and retaliation claims as a matter of law. The breach of contract claims proceeded to the jury, however, which returned a verdict in David's favor and awarded $ 51,794.61 in damages. From those determinations, both David and ANA now perfect appeals.

## DISCUSSION

### David's Employment Discrimination Claim

On appeal, David contends that the district court should have concluded that his discharge from employment with ANA was a result of discrimination, in violation of Michigan's Elliott-Larsen Civil Rights Act. As noted in prior Sixth Circuit decisions, Michigan courts utilize Title VII analysis in resolving claims brought under the Elliott-Larsen Civil Rights Act. *See Booker v. Brown & Williamson Tobacco Co., Inc.*, 879 F.2d 1304, 1311-12 (6th Cir. 1989). *See also Town v. Michigan Bell Tel. Co.*, 455 Mich. 688, 568 N.W.2d 64, 68-69 (Mich. 1997). Consequently, a plaintiff alleging discrimination based upon national origin may establish a prima facie [*10] case by introduction of either direct or circumstantial evidence of discrimination. *See Talley v. Bravo Pitino Restaurant, Ltd.*, 61 F.3d 1241, 1246 (6th Cir. 1995).

David does not assert that the record before this court establishes direct evidence of discrimination. In order to succeed on this claim, therefore, the plaintiff must produce circumstantial evidence of discrimination by use of the now-familiar analysis of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 36 L. Ed. 2d 668, 93 S. Ct. 1817 (1973). Pursuant to that analytical framework, David must first establish a prima facie case by demonstrating "(1) that he is member of a protected group, (2) that he was subject to an adverse employment decision, (3) that he was qualified for the position, and (4) that he was replaced by a person outside of the protected class." *Talley*, 61 F.3d at 1246. If he succeeds in that endeavor, the burden of production shifts to the employer to articulate a legitimate, non-discriminatory reason for the employment action. *See id.* (citing *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 254-56, 67 L. Ed. 2d 207, 101 S. Ct. 1089 (1981)). [*11] The burden of production then shifts back to the plaintiff to attempt to establish that the reasons proffered by the employer are only pretexts for invidious discrimination. *See id.*

In this case, David claims that as an American-born Arab-American, he was in a distinct group of individuals entitled to protection from discrimination based solely on his place of birth. Furthermore, ANA does not seriously dispute that David

lexisONE(sm) Free Case Law
Case 1:02-cv-00075-HJW    Document 27-2    Filed 09/08/2003    Page 18 of 22
Page 6 of 10

suffered an adverse employment action or that he was qualified for the position he once filled. Finally, there is no dispute that Mahar Mattan, a Syrian-born individual, replaced David in ANA's Detroit offices. But even if the plaintiff succeeds in establishing a prima facie case, as the district court apparently ruled that he could, we conclude that ANA provided a legitimate non-discriminatory reason for its employment decision. The burden on the defendant in such a situation is slight indeed. To satisfy its evidentiary requirement, the employer need only *articulate* an acceptable explanation for its actions; the reason given need not be convincing. *See, e.g., Burdine*, 450 U.S. at 254; *Wrenn v. Gould*, 808 F.2d 493, 501 (6th Cir. 1987). [*12]

According to the company, David's reduced interactions with the president and chief executive officer of ANA did not result from discrimination, but rather from a management style different from that employed by Hakki's predecessor and from the plaintiff's inability to increase revenues significantly. Furthermore, after receipt of David's inflammatory and threatening letter protesting his treatment at the company, his employer felt that an effective working relationship with the plaintiff was no longer possible.

Moreover, the appellate record contains no evidence that ANA's explanation was only a pretext for forbidden discrimination. In fact, testimony shows that Hakki maintained cordial and professional relationships with all other non-Arab-born employees and that his difficulties with David *were* related to personality conflicts, the plaintiff's unprofitable sales record and to the physical distance between ANA headquarters and David's Detroit base of operations. Absolutely no indication exists that Hakki harbored negative feelings toward any individual on account of that person's place of birth. Evidence of the ongoing employment relationships with Montalvo and Brownlee severely [*13] undermines David's argument to the contrary. Additionally, prior to the transmission by the plaintiff's attorney of the letter to Middle East Broadcasting in London, ANA was not considering firing David, even in light of ANA's failure to meet its sales projections in the plaintiff's job area. Thus, because no evidence supports the plaintiff's claim of invidious discrimination based upon national origin, the district court properly granted the defendants judgment as a matter of law before submitting this claim to the jury.

### David's Retaliation Claim

David also contends that the defendants violated the anti-retaliation provisions of the Elliott-Larsen Civil Rights Act by terminating his employment as retribution for stating his intention to claim discrimination based upon national origin. Hakki and ANA do not dispute that David was fired following receipt of a letter from the plaintiff's lawyer to Dr. Masry setting forth David's beliefs that he was being treated differently because he was born in the United States rather

than in an Arab nation. To state a valid claim under the Michigan statute, however, more than mere retaliatory action is required.

By the terms of M.C.L. [*14] A. § 37.2701(a), a person may not "[retaliate or discriminate against a person because the person has opposed a violation of this act, or because the person has made a charge, filed a complaint, testified, assisted, or participated in an investigation, proceeding, or hearing under this act." It is undisputed that, at the time of his discharge, David had not yet "made a charge, filed a complaint, testified, assisted, or participated in" proceedings under the act. Any claim of illegal retaliatory conduct, therefore, must arise from David's opposition to a violation of the Elliott-Larsen Civil Rights Act. Furthermore, that opposition must be a "significant factor" in the adverse employment action. See *Moore v. Kuka Welding SYS. & Robot Corp*, 171 F.3d 1073, 1080 (6th Cir. 1999).

Under federal law, a retaliation claim made under the analogous opposition clause of Title VII "requires that the employee have a reasonable belief that the practice the employee is opposing violates Title VII." *Wyatt v. City of Boston*, 35 F.3d 13, 15 (1st Cir. 1994). See also *Bigge v. Albertsons, Inc.*, 894 F.2d 1497, 1501 (11th Cir. 1990); *Sias v. City Demonstration Agency*, 588 F.2d 692, 696 (9th Cir. 1978). [*15] The plaintiff need not show that a violation actually occurred. "[It is good faith and reasonableness, not the fact of discrimination, that is the critical inquiry in a retaliation case." *Rucker v. Higher Educ. Aids Bd.*, 669 F.2d 1179, 1182 (7th Cir. 1982). Because the Elliott-Larsen Civil Rights Act is otherwise analyzed by reference to Title VII law, see *e.g., Brocklehurst v. PPG Indus., Inc.*, 123 F.3d 890, 894 (6th Cir. 1997), Title VII principles should also apply to retaliation claims brought pursuant to that state statute.

Analysis of the plaintiff's claims under the federal law framework leads to the inescapable conclusion in this matter that David could not reasonably have believed that his threats of legal action were in response to discriminatory acts. As stated in the discussion of the plaintiff's discrimination claim, David has adduced absolutely no evidence from which a reasonable person could conclude that national origin played any part in Hakki's employment decisions. The undisputed fact that other American-born employees of ANA were not terminated by ANA emphasizes that any adverse action against the plaintiff was related to his [*16] job performance and to personality conflicts, not to his nation of birth. Because the plaintiff could not reasonably believe he was opposing acts of discrimination based upon national origin by threatening legal action, the district court also properly granted judgment as a matter of law on David's retaliation claim.

**David's Claim Under Michigan's Whistleblowers' Protection Act**

David also raised a claim under Michigan's Whistleblowers' Protection Act, M.C.L.A. §§ 15.361-15.369, alleging that his termination was in response to his threat to report Hakki and the company for discrimination based upon national origin. Pursuant to section 2 of the act, M.C.L.A. § 15.362:An employer shall not discharge, threaten, or otherwise discriminate against an employee regarding the employee's compensation, terms, conditions, location, or privileges of employment because the employee, or a person acting on behalf of the employee, reports or is about to report, verbally or in writing, a violation or a suspected violation of a law or regulation or rule promulgated pursuant to law of this state, a political subdivision of this state, or the United States to a public body, unless  [*17]  the employee knows that the report is false, or because an employee is requested by a public body to participate in an investigation, hearing, or inquiry held by that public body, or a court action.

In order to establish a prima facie case of a violation of the Whistleblowers' Protection Act, the plaintiff must demonstrate that (1) he was engaged in protected activity, (2) he was discharged from employment, and (3) a causal connection exists between the protected activity and the discharge. *See Shallal v. Catholic Soc. Servs. of Wayne County*, 455 Mich. 604, 566 N.W.2d 571, 574 (Mich. 1997). As in *Shallal*, regardless of the plaintiff's potential for success on other prongs of the prima facie case analysis, he cannot establish in this matter the requisite connection between the alleged protected activity and the discharge. Michigan law demands that a whistleblower plaintiff's primary motivation be "a desire to inform the public on matters of public concern, and not personal vindictiveness." 566 N.W.2d at 579 (quoting *Wolcott v. Champion Int'l Corp.*, 691 F. Supp. 1052, 1065 (W.D. Mich. 1987)). Here, the plaintiff's motives in threatening court or  [*18]  agency action were not altruistic, but rather were intended merely to derail attempts by the employer to visit adverse job consequences upon the plaintiff. Under such circumstances, no jury could legally find in favor of David on this particular claim. The district court, therefore, appropriately granted judgment as a matter of law to the defendants on this cause of action.

### ANA's Counter-Claim

The district court did allow two claims raised by David to proceed to the jury for consideration. Both the plaintiff's claim for $ 753 in damages for breach of an oral contract and a claim for damages for breach of a written contract of employment were reviewed by the fact-finders. In each instance, the jury determined that the plaintiff should prevail.

The breach of oral contract claim arose from David's allegation that ANA had promised but failed to reimburse him for a $ 753 airline ticket to Washington for a meeting scheduled to discuss David's dispute with the company. On appeal, ANA does not contest the correctness of the jury's conclusion that the

company is liable to David for the promised amount of the airfare.

The plaintiff also insisted, however, that ANA breached a [*19] *written* contract with him when the company failed to reimburse him for sales commissions and for unused vacation time. After the jury awarded David $ 50,000 in damages for the lost commissions and an additional $ 1,041.61 in vacation pay, ANA moved for a new trial or, in the alternative, for remittitur. The district court denied those requests, and the company now asserts on appeal its claim that the jury award for lost commissions is excessive and not supported by the evidence.

Under Michigan law, the applicable law for determining the excessiveness of a jury verdict in this diversity case, *see generally Gasperini v. Center for Humanities, Inc.*, 518 U.S. 415, 135 L. Ed. 2d 659, 116 S. Ct. 2211 (1996), federal courts review such claims only to determine "whether the jury's award is supported by the evidence." *Snell v. UACC Midwest, Inc.*, 194 Mich. App. 511, 487 N.W.2d 772, 776 (Mich. Ct. App. 1992). The district court concluded that the $ 50,000 award for unpaid commissions was supported by testimony adduced at trial. After our review of the record, we are unable to concur in that assessment.

The parties agree that David's written employment contract [*20] with ANA called for the plaintiff to receive a 2.5% commission on gross advertising revenues during his tenure with the company. Moreover, he was also to receive, after leaving the company, "commissions on all advertising revenues later received from any sales contracts entered into at any time prior to [his] separation date."

In justifying the jury's $ 50,000 commission award to the plaintiff, the district court noted that the evidence at trial showed advertising revenues totaling $ 2 million during the last year of David's employment with ANA. According to the trial court, the plaintiff's 2.5% commission on $ 2 million would equal the $ 50,000 figure reached by the jury. The record before this court does not, however, support the district court's assertion that ANA generated $ 2 million in advertising revenues during 1995. Instead, the evidence most favorable to the plaintiff indicates only that sales during the applicable year totaled approximately $ 1.7 million. David's 2.5% commission on such an amount would equal $ 42,500, an amount obviously less than the $ 50,000 figure reached by the jury.

David nevertheless insisted that a number of the sales contracts he procured would [*21] be renewed by the principal parties, thus extending his commission payments beyond the deadline imposed by ANA. We conclude that the language of the commission agreement, as set out above, does not support the proposition that David was entitled to receive commissions on future renewals. It follows that the $

50,000 verdict returned by the jury in the plaintiff's favor, on motion of the defendants, should have been reduced to $ 42,500.

## CONCLUSION

For the reasons set out above, we conclude that the district court appropriately entered judgment in favor of the defendants on David's claims of discrimination, retaliation, and violation of state whistleblower provisions. We further conclude, however, that the court should have granted the defendants' motion for remittitur on the issue of damages for breach of the sales commission agreement. We therefore AFFIRM the district court's opinion in part, REVERSE it in part, and REMAND the case for entry of an order of remittitur on the issue of damages.

**Viewing:3 of 7 Results**

Previous | Next

Return to Search Results ► ►

Compose a New Search ► ►

Back to Top ► ►

SEARCH lexisONE Site ▼  GO

 **LexisNexis**™
www.lexisnexis.com

Customer Support    Site Map    LawCommerce.com

Terms & Conditions    Privacy

© 2003 LexisNexis, a division of Reed Elsevier Inc. All rig