UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

DONNA SCOTT

        Plaintiff,

v.

THE UNION CENTRAL LIFE
INSURANCE COMPANY

        Defendant.

Case No. C-1-02-075
J. Weber; Mag. J. Hogan

**PLAINTIFF'S PROPOSED FINDINGS OF FACT**

1. Plaintiff Donna Scott was born August 21, 1947.

2. She began her employment with Defendant Union Central in 1985 as a Policy Typist and Exchange Clerk. (Scott Dep., 106). In 1989, she assumed the role of Benefits Clerk, and approximately one year later, she was promoted to Senior Benefits Clerk. (Scott Dep., 110, 112). Later, Ms. Scott became an Employee Records Clerk in the Human Resources Department. (Scott Dep., 91). While in Human Resources, Ms. Scott received numerous letters of praise.

3. Then in 1993, Ms. Scott transferred from the Human Resources Department to the Annuities Department where she worked as an Annuity Client Service Representative ("CSR").

4. While in her position as a CSR, Ms. Scott obtained several professional licenses, which furthered her knowledge of the field and her ability to service her clients and agencies.

5. Throughout her tenure with the company, Plaintiff consistently received

performance reviews that indicated she was meeting or exceeding Defendant's expectations. (See Scott Dep. Exs.12-23, 26-29).

6. Not long into her employment in the Annuity Department, Plaintiff realized a discrepancy in pay. As early as her 1995-1996 review, Plaintiff made her concerns regarding salary known to Defendant in her written comments on her review. (Scott Dep., Ex. 21).

7. Human Resources Representative Connie Retherford testified that Ms. Scott began to come in and discuss salary concerns when males were hired into the Annuity Department with higher salaries than Ms. Scott. (Retherford Dep., 109, 111). Ms. Scott also made Ms. Deppen, and her team leaders Jill Krebs, Eddie Ericson, and even current President John Jacobs who was a vice president at the time, aware of her concerns regarding unequal pay. (Deppen Dep., 128; Krebs Dep., 27; Ericson Dep., 49; Scott Dep., 85).

8. Other, younger men who also worked as CSR's with less experience than Plaintiff like Eddie Ericson and Dan Woodard received considerably higher pay. (See Ex. 1, Attached to the Affidavit of George M. Reul, Jr.)

9. In addition to noting the inequality in pay, Plaintiff and a number of other employees became concerned with how younger men were treated within the department. (See Ex. 2, attached to GMR Aff.)

10. Jeremy Whiting was 32 at the time that Ms. Scott was discharged. He was a CSR; however, he could not perform many of the duties of the position for at least a year and a half because he failed to pass his Series 6 test. (Scott Dep., 80). Mr. Whiting took four attempts to pass the test, and continued to work as a CSR during the entire time. (Retherford Dep., Ex. 7). Ms. Scott and several other women were given a fairly short deadline and told

if they did not pass by then they were fired; Mr. Whiting did not receive such restrictions. (Scott Dep., 80).

11. At least one women, Bev Childs was removed from the position because she was unable to pass the Series 6. (Deppen Dep., 37-38). Mr. Whiting had other performance issues as a CSR, but he was not terminated or removed from the position. (Ericson Dep., 26).

12. Dan Woodard was also a CSR in his early thirties at the time that Ms. Scott was working for Union Central. (Deppen Dep., 70). During his tenure as a CSR, he had several issues that were overlooked by management. For example, multiple employees raised concerns that Woodard was engaging in inappropriate behavior with another female co-worker, which several employees found to be highly offensive. (Retherford Dep., Ex. 7). Mr. Woodard made numerous personal calls, which were distracting to others working near him, and he was not disciplined. (Deppen Dep., 82). Mr. Woodard made numerous personal calls, which were distracting to others working near him, and he was not disciplined. (Deppen Dep., 82). Many employees complained that Mr. Woodard brought in a television to watch NCAA Tournament. (Retherford Dep., 208). Despite these issues, Mr. Woodard was promoted to Team Leader. (Deppen Dep., 82).

13. Edwin Ericson was also treated more favorably. Mr. Ericson was in his early 20's when he was hired into the company on February 3, 1997. (Ericson Dep., 7). Just two years later, in March of 1999, Mr. Ericson was promoted to the Team Leader position. (Ericson Dep., 9). Mr. Ericson had no background in Annuities or insurance in general; however, by 1999, he was already making more than Ms. Scott and several other long time female employees. (Ericson Dep., 9).

14. Plaintiff reported to her team leader Jill Krebs that there was favoritism in the department, in particular that Scott in addition to her pay, Plaintiff did not believe that she was being treated fairly with regard to how her performance was reviewed. (Deppen Dep., 125, 135; Ericson p. 47). In addition, Ericson was aware that Plaintiff had in the past expressed concerns about Deppen's equity and fairness. (Ericson Dep. p. 47).

15. In general, Ms. Scott's work was more closely scrutinized by Ms. Deppen. (Scott Dep., 86). She was singled out and belittled in front of co-workers by Ms. Deppen. (Scott Depo., 90-91). Ms. Scott was given unfair allotments and smaller salary increases. (Scott Dep., 85). For example, when Ms. Scott passed the Series 6 test, she was one of the last people to be "bumped up" to the next pay level. (Retherford Dep., 64). Ms. Scott was not even being paid the minimum of the salary range for her pay level. Id.

16. In late 1999, Deppen recommended that Plaintiff step down from the rep job into another position. (Scott Dep. 13-14). At the time, Deppen advised Scott that she should take the payment processing because "you're getting older and tired and need a rest from the rep job." (Scott Dep., 13).

17. Other older women have also been involuntarily moved out of the department and placed in other roles by Ms. Deppen. Darlene Baker, who was 51 at the time of Ms. Scott's termination, was moved to the call center. (Retherford Dep., 236). Donna Anderson, who was 55, was involuntarily placed in New Business shortly after Ms. Scott's termination. (Anderson Dep., 12). Ms. Anderson started in the company in 1986 and has always had positive reviews. (Anderson Dep., 7, 13).

18. Sometime after Rick Pretty became in charge of the annuity division in 1996,

Defendant instituted a "Key Award" program to recognize employees for outstanding service. (Pretty Dep. pp. 59-60). As part of the rollout for that program, Pretty advised the reps that if they were complemented by a customer or agent for good service that it was "perfectly acceptable" for the reps to ask the person to write a note to their manager for submission in the "Key Award" program. Id. pp. 61-62. Based on Pretty's instructions, Plaintiff solicited positive feedback from customers when they told her that she was doing a good job.

19. Sometime in November, 2000, Defendant came across a letter sent by Plaintiff that was returned from one of her clients that requested positive feedback from the client. (Krebs Dep., 38). The letter incorrectly stated that Plaintiff had a performance review the next month. (Id.).

20. A "For the Record" written warning was issued to Plaintiff on February 5, 2001 to not only address the letter, but to also address alleged performance concerns. (Pretty Dep., 66, Retherford Dep., 123, 130). The discipline addressed complaints about her performance from other reps and outside agents. (Retherford Dep. Ex. 1).

21. Although complaints may have been received about Plaintiff, there were other reps whom Ericson had received internal complaints about not answering the phone. Id. It was an issue that Plaintiff's team leader Ericson had discussed with every rep he supervised, including Plaintiff, on a regular basis. Id.

22. The written warning also addressed alleged complaints from external agents that primarily involved one particular agency, Agency 34 in South Bend, Indiana. (Ericson Dep., 38, Ericson Dep. Ex. 2). Complaints from agents and agency relationships were not issues that were limited to Plaintiff. Mr. Ericson discussed with every rep under him these issues on a fairly

regular basis. (Ericson Dep., 43). With regard to agency 34, Ericson admitted that he had never discussed any complaints he received from the agent with Scott because she was on a leave of absence when they were received. (Ericson Dep., 38).

23. Any concerns regarding Plaintiff's performance were addressed as part of the written warning she received on February 5, 2001. (See Ericson Dep. Ex. 2). There were no performance issues of any kind with Plaintiff after February 5, 2001. (Ericson Dep., 88).

24. Every performance evaluation during Ms. Scott's time in Annuity before she engaged in protected activity reflected that she was performing to the company's expectations. (Scott Dep., Ex. 12-23, 26-29). Both her last two team leaders Krebs and Ericson admitted that Ms. Scott was well qualified for the position of Client Service Representative. (Ericson Dep., 37; Krebs Dep,. 24).

25. Concerned that she had been singled out for discipline when other younger male employees like Dan Woodard and Jeremy Whiting had been treated more favorable, Plaintiff engaged in a protected activity by making verbal and written complaints regarding her treatment by Ms. Deppen.

26. Plaintiff was concerned because the written discipline was inconsistent with the verbal warnings that other reps had received when issues were raised with them about not answering the phone or agency complaints. (See Retherford Dep. Ex. 2). Plaintiff also raised the concern that she had not previously received any prior reports or verbal warnings about many of the issues raised. Id. Indeed, Ericson confirmed that Plaintiff had been unaware of the complaints from Agency 34. (Ericson Dep., 38).

27. Ms. Scott sent two separate written memoranda complaining of discrimination

by Ms. Deppen to Ms. Retherford and Mr. Pretty dated February 5, 2001 and March 6, 2001. (Retherford Dep., Ex. 2). In addition, the memoranda to Mr. Pretty and Ms. Retherford requested a meeting to discuss her allegation against Ms. Deppen and an investigation. Id.

28. Only two weeks after complaining that Deppen had discriminated against her, Plaintiff received the only bad performance review in her long career at Defendant. (Scott Dep. Ex.29).

29. . Mr. Pretty and Ms. Retherford met with Ms. Scott in March of 2001, and at that meeting Ms. Scott "made it clear that she felt she was being discriminated against or harassed." (Pretty Dep., 75). Plaintiff advised Pretty and Retherford that she thought the poor treatment she received had been based on her gender and age. (Retherford Dep. Ex. 2).

30. In raising her concerns, Plaintiff addressed Mr. Woodard's behavior, the comment that Deppen had made to her about being "older and tired", and also pointed out that she believed that Ms. Deppen had encouraged dishonest behavior in the past. In particular, Deppen had told the department to lie to clients and agents about the real reason why their work was not getting processed correctly or a timely manner because there were problems related to the computer system.

31. As a result of Plaintiff's complaint, Human Resources met with the employees in a department wide investigation. (Retherford Dep., 143).

32. Many of the issues raised by Plaintiff were confirmed by others in the department. (See Ex. 2, attached to GMR Aff.). For example, Plaintiff had reported that Ms. Deppen had told the department not to tell clients or agents that there was a system problem when they asked why something was wrong.

33. Retherford interviewed everyone in the department discussing a variety of topics including whether anyone in management had asked them to lie. (Retherford Dep., 173). In response to this question, several people from the department answered by saying that Ms. Deppen had asked them not to tell clients or agents if there was a problem with the system, and they felt uncomfortable doing so. (Retherford Dep., 174, Ex. 7; Ex. 2, attached to GMR Aff.). At least one employee agreed with Ms. Scott that yes, management had asked them to lie. (Pretty Dep., 86).

34. Mr. Pretty admitted in his testimony that three responses referenced the system problems. (Pretty Dep., 85). Also, after reviewing the responses, Ms. Deppen reluctantly admitted that "[t]here were three or four" employees who expressed concern about what they were told to say about the computer system. (Deppen Dep., 206).

35. Despite these similar responses from co-workers, Defendant claimed that Ms. Scott's accusation about Ms. Deppen was false. (Pretty Dep., 87).

36. Several other issues Plaintiff raised were confirmed in the investigation. In fact, Ms. Retherford wrote in a memorandum to Mr. Pretty that "[e]mployees did have concerns over some of the same issues that Donna has brought to my attention." (Retherford Dep., Ex. 7).

37. Numerous employees expressed concerns regarding Mr. Woodard's behavior and favoritism by management. (Id.). For example, one employee stated in the investigation that "Dan has been made team leader and does absolutely nothing…He just does not do his work-he has others work for him…" (Ex. 2, attached to GMR Aff. at UC 0160).

38. In addition, some employees feel that there is a favoritism in the department;

one individual stated "[t]here are favorites-certain people get away with things." (Investigation, UC 0161). Finally, Ms. Retherford expressed concern that Team Leaders salaries were not reduced when they were no longer performing the role with extra responsibilities. (Retherford Dep., Ex. 7).

39. Despite acknowledging that Plaintiff had clearly complained about gender or age discrimination, Retherford's investigation never specifically asked any of the employees whether they thought there was discrimination in the department. (See Ex. 2 attached to GMR Aff.)

40. Within a week of reporting the results of the investigation which concluded that "Employees did have concerns over some of the same issues that Donna has brought to my attention," Defendant fired Plaintiff on April 17, 2001.

41. Union Central maintains that it discharged Ms. Scott due to a "pattern of dishonesty" and performance issues. However, Plaintiff had previously been disciplined for any alleged performance problems and the letters she sent out which the company maintains were dishonest. (Ericson Dep., Ex. 2).

42. It is undisputed that apart from her protected activity in complaining about Deppen, nothing occurred after the written warning had been issued that could have possibly warranted her discharge.

43. Several other employees mentioned the computer system in direct response to the question of whether management had ever asked them to lie. (Ex. 2, attached to GMR Aff.). Ericson, who continued to supervise Plaintiff in her new role, admitted that Ms. Scott did not have any performance problems in the new role. (Ericson Dep., 88).

44. After Ms. Scott's termination, a younger employee was placed in Ms. Scott's

previous position in the Fund System. (Deppen Dep., 215). Kim Redden, who now performs the duties of the Fund System, is substantially younger than Ms. Scott and was 38 years old when Ms. Scott was terminated.

Respectfully submitted,

_____
Randolph H. Freking, Esq. (0009158)
George M. Reul, Jr., Esq. (0069992)
Trial Attorneys for Plaintiff
FREKING & BETZ
215 East Ninth Street Fifth Floor
Cincinnati, OH 45202
(513) 721-1975

### CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing was served upon Deborah DeLong, Esq., Dinsmore & Shohl LLP, 1900 Chemed Center, 255 East Fifth Street, Cincinnati, OH 45202 by regular U.S. Mail this 18 day of August, 2003.

_____