1  fired?
2  A. I don't think so. I would have supported it, though.
3  Q. It's fair to say you agreed with the decision to fire
4  Miss Scott?
5  A. I did.
6  Q. What -- I want you to think, listen to this very carefully:
7  What is your understanding from what you've been told by --
8  Mr. Pretty told you he fired Miss Scott and told you why;
9  right?
10 A. That's correct.
11 Q. Okay. What is your understanding of the reason for her
12 termination?
13 A. For the dishonesty aspect of making false claims against
14 me, telling the division -- or telling him that I told the
15 division to lie on a regular basis, and that I was personally
16 discriminating against her.
17      MR. FREKING: Could the witness be handed her
18 deposition, please, from February 10th of 2003?
19 Q. Ma'am, do you recall that February of 2003 we conducted
20 your deposition?
21 A. Yes.
22 Q. Do you remember you were sworn in and that your testimony
23 was -- you were sworn to tell the truth and your testimony was
24 transcribed by a court reporter?
25 A. Yes.

  1      MS. DELONG: Your Honor, I'm going to object because
  2  that wasn't the end of the witness's answer to that question.
  3      THE COURT: You can complete it during your --
  4  A. Exhibit Number 9 is the -- is the letter that Donna wrote
  5  to Rick.
  6  Q. Oh, okay. The February 5th letter --
  7  A. That's correct.
  8  Q. -- that Ms. Scott wrote to Rick?
  9  A. Yes.
 10  Q. Right?
 11  A. Yes.
 12  Q. And the March 6th letter; right?
 13  A. Yes.
 14  Q. Is it fair to say, ma'am, when you were in your deposition
 15  you said that the reason for her termination was the
 16  accusations that she made in those two letters?
 17  A. Yes.
 18  Q. All right. And the accusations that she made in those two
 19  letters were that you were discriminating against her on the
 20  basis of her age and gender?
 21  A. Yes.
 22  Q. Now, in your deposition you said something like, "That and
 23  the fact that I told people to lie and -- what else?" It says
 24  here you're reviewing the document.
 25      You would agree with me that in these complaints of

1  them to lie to our customers.
2  Q. You were told it was two people, right, or a couple?
3  A. Two and Donna?
4  Q. Two and Donna?
5  A. Is that correct? I mean, I think that's what I was told.
6  Q. But that's what you were told?
7  A. I don't recall exactly.
8  Q. But that's what you were told?
9  A. Yeah.
10 Q. So other people also in addition to Donna perceived what
11 you were telling them to be a lie; right?
12 A. Not to be a lie but to that I told them to lie, yes.
13 Q. But you told them to lie. So they, if Donna was guilty of
14 telling a lie about that, so were these other two employees at
15 least, right, at least on that part?
16 A. Perhaps.
17 Q. Right? So you got three people kind of committing the same
18 lying offense; right? Right? The difference between
19 Miss Scott and those other two employees was the fact that she
20 filed, as you say in your deposition, the letters of February
21 5th and March 6th; right? The gender discrimination complaint?
22 A. That is true.
23 Q. So but for her submitting this -- these complaints of
24 gender and age discrimination, she would not have been fired?
25 A. There was also the letters that she was sending out that

1  pointed to, I think, dishonesty. "Please throw this letter
2  away."
3  Q. Okay. All right. Now, I've blown up your deposition
4  testimony that you just read in the prior part, "What is your
5  understanding," all the way down this stuff about the rest of
6  it. Okay. And, you know, "What is your understanding of the
7  reason? It was the accusations that could not be corroborated.
8  And what accusations are those?"
9      And the accusations you refer to are the accusations in the
10 February 5th and March 6th letter; right?
11 A. That's --
12 Q. And the February 5th and March 6th letters are clearly
13 complaints of employment discrimination?
14 A. Yes. And that --
15 Q. And had she not filed those letters complaining of
16 employment discrimination, she would not have been fired?
17        MS. DELONG: Objection.
18 A. It's --
19        MS. DELONG: She did not make the decisions.
20        THE COURT: She didn't make the decisions, but she can
21 answer the question, if you know.
22 A. I would say that it was a culmination of all of the events.
23 Giving Donna the benefit of the doubt, for the "for the
24 record," I mean, when we did the "for the record" with the
25 letters that had gone out, the poor service, all of it.

1  performance issues were.
2  Q. How about after? Did she have any performance problems?
3  A. Once she was off the job, no.
4  Q. She was given some other job?
5  A. Yes.
6  Q. Right?
7  Now, when she was given that job, was that around the other
8  client service reps, like maybe move over a cube, or was that
9  on the back of the floor where nobody else worked?
10 A. Our division was maybe four rows of people. It was on the
11 opposite -- the fourth row, and the client service reps were
12 probably on the first or second row. Not at the other end of
13 the floor or anything.
14 Q. Between there there were some empty cubes?
15 A. No. There were support people and the mail desk and it was
16 all part of the same division. It wasn't like she was outside
17 the division. The same place basically that the person who is
18 working on it today sits.
19 Q. Now, I think I heard you testify about these letters and
20 this concern about this November letter. Did you testify that
21 the company only received complimentary letters from
22 policyholders or should only receive them from policyholders?
23 A. No.
24 Q. Who do -- who can letters of complimentary letters come
25 from?

1  Q. And he recognized the fact it was bad judgment?
2  A. Yes.
3  Q. Did that give him some points, the fact that he said, ah,
4  yeah, you're right, that's bad judgment?
5  A. I don't think he said that. He just said, I'm sorry, I
6  didn't know I shouldn't have, and --
7  Q. He said he didn't know he shouldn't be watching TV?
8  A. I said that -- he didn't say -- I don't know that he said
9  that I didn't -- I shouldn't have been watching television. He
10 just apologized for it, said he would never do it again.
11 Q. And was that important, the fact that he said he would
12 never do it again?
13 A. Yes.
14 Q. Yeah. And after February 5th of 2001, are you aware of any
15 efforts by Ms. Scott to ever solicit a compliment from a
16 customer, client, employee, agent, or anyone else in the world?
17 A. I am not. And the program was eliminated anyway.
18 Q. Are you aware of any violation of any kind of rule, policy,
19 procedure, practice, anything of Union Central Life by
20 Miss Scott after February 5th of 2001?
21 A. Not to my knowledge.
22 Q. Okay.
23 A. Other than the false accusations that she made.
24 Q. False accusations of sex and age discrimination?
25       MS. DELONG: Objection.

1  Q.  "For the record" was issued to Ms. Scott on about February
2  5th of 2001; right?
3  A.  I believe so, yes.
4  Q.  And you know that that "for the record" did not cover just
5  that letter?
6  A.  That's correct.
7  Q.  It covered a bunch of performance, alleged performance
8  issues; correct?
9  A.  Yeah, there were a number of items in the "for the record",
10 yes.
11 Q.  All right.  So by February 5th when she received that
12 disciplinary notice, it covered performance in the past; right?
13 A.  Yes.  As of the time the "for the record" was issued, yes.
14 Q.  And it's the policy and practice of Union Central not to
15 discipline someone a second time for something they've already
16 been disciplined for previously?
17 A.  I don't know if that's the specific policy.
18 Q.  Isn't that the practice?
19 A.  You know, good management would -- good management practice
20 would be you discipline somebody, you give them an opportunity
21 to correct the situation, and move on.
22 Q.  Right.  I think Miss Retherford the other day said
23 something along the lines of here is your "for the record," and
24 we're talking about performance concerns, we're talking about
25 this letter, all you have to do after this is just do your job

1  satisfactorily; right?

2  A. Okay.

3  Q. Okay. After February 5th, 2001 isn't it true that in the

4  job she was doing she did her job satisfactorily?

5  A. I believe her job was changed, and as far as I know, she

6  did that new job satisfactorily.

7  Q. And the other thing that she was told in the "for the

8  record" is do not send out any more letters of solicitation, if

9  that's what it was?

10 A. That was, I believe, instructed in the written "for the

11 record".

12 Q. Right. And you know for a fact that she did not send out

13 any more letters of solicitation?

14 A. Well, I don't know for a fact, but I'm not aware that she

15 did.

16 Q. Okay. And then the next thing that happened was she filed

17 a internal complaint of discrimination?

18 A. Well, no, actually what happened is in the conversation on

19 the "for the record" which I guess followed the issuance of the

20 "for the record," she asked for a meeting to discuss it and so

21 she -- Donna met with Connie Retherford and myself to discuss

22 it and in that meeting made some accusations, some verbal

23 accusations about her manager.

24 Q. Okay. And then she followed that up with a letter?

25 A. I don't recall the letter. That's probably true.

1  ever asked you to lie, you would have looked at the responses
2  of that?
3  A.  Yes.
4  Q.  Okay.  Now, when you received Exhibit 15 --
5  A.  Um-hmm.
6  Q.  -- the summary report where, would you agree with me, that
7  Miss Retherford told you in that memo that there were some
8  other employees who corroborated Miss Scott's view that males
9  were treated differently than females to some extent?
10 A.  I see references to favoritism to certain service reps, not
11 necessarily men.  The main concern of the majority of employees
12 is Dan Woodward's behavior -- Woodard's behavior.
13 Q.  There's some reference to Whiting and --
14 A.  Some individuals were also concerned with Jeremy Whiting.
15 Q.  Okay.  Did you do anything after you got this report?  I
16 know you decided to fire Miss Scott because of something.
17 A.  False accusations, yes.
18 Q.  Okay.  Did you do anything with respect to the
19 discrimination findings she made?
20 A.  I -- I probably would have had a conversation with Becky to
21 let her know that there were situations, perceptions related to
22 Dan Woodard and Jeremy Whiting in particular.
23 Q.  Do you remember such a meeting with Miss Deppen?
24 A.  I don't remember specifically.
25 Q.  Did you document --

1  A.  That would have been my practice to have that conversation.
2  Q.  Your practice would have been to have a conversation like
3  that?
4  A.  Sure.
5  Q.  Because of the perception of the female -- some female
6  employees that there was some discrimination going on?
7  A.  The perception that apparently some males were being
8  treated differently, yes.
9  Q.  Now, when you -- does it, now that you've looked at that
10 Exhibit 16, just kind of refreshed me, I think it was attached
11 to Exhibit 15, that detail, and you say you read it at some
12 point, you don't recall any -- you don't recall during this
13 time frame forming an impression that some employees actually
14 thought you were the one who preferred male employees like
15 Mr. Ericson and Mr. Woodard because they were the bread winners
16 and fit this profile?
17 A.  Again, I don't recall any reference to the bread winner
18 issue.  I know I became aware at some point, whether it was
19 after reading this or over the process of the last four years
20 that this, the process, was going through here, that I became
21 very aware of it that there were some females that had that
22 perception.
23 Q.  Well, other than your belief that your practice would have
24 been to talk to Miss Deppen about it, was anything done,
25 specific, concrete, other than maybe talking to Deppen?

1  discuss your reasons with Becky Deppen?  You would tell Becky
2  why you fired her?
3  A.  Yes.
4  Q.  Okay.  Did you put anything in writing like a letter?  Did
5  you ever give Miss Scott a letter, a memo, a form, putting in
6  writing the reasons?
7  A.  Did I personally?  I don't believe so.
8  Q.  Did the company to your knowledge ever put in writing,
9  like, you know, Dear Donna, you're hereby being terminated for
10 the following reasons?
11 A.  I don't recall.
12 Q.  Okay.  But it would have been logical to talk to Becky
13 Deppen and she would be able to form an understanding of why
14 Miss Scott was fired?
15        MS. DELONG:  Objection.  I don't think that's a
16 question.
17        THE COURT:  Well, rephrase the question.
18 Q.  Do you think given your knowledge and your dealings with
19 Becky Deppen, do you believe that she was in a position to form
20 an understanding as to why you fired Donna Scott?
21 A.  Yes.  I would have expected Becky knew why.
22 Q.  Thank you.
23    Would you -- there is, I think, a calculator up there
24 someplace.  Is it still up there?
25    Now, you're aware, sir -- and Woodard, I believe, was hired

1  accusations with her manager that her manager told the
2  department to lie; that told Eddie to lie. And when I found
3  those things to be false accusations and combined that with the
4  letter writing that had been done to customers inappropriately
5  using some dishonesty or deception in that with respect to when
6  her reviews were actually coming up and why she was asking,
7  soliciting that kind of information, combined that with the
8  fact that she used that to win our Key Award campaign to -- or
9  Key Award program to have an advantage over her fellow workers,
10 that whole picture, to me, was a pattern of dishonesty and
11 deception and grounds for termination.
12 Q. Did her performance issues play any part?
13 A. Her performance problems did not play -- that was not the
14 reason she was terminated. She was terminated for dishonesty.
15 That was the reason that was grounds for immediate termination.
16 The performance problems were already recorded in the "for the
17 record."
18 Q. Let's talk about the meetings. Were you present in the
19 meeting when Becky Deppen and I believe Eddie Ericson met with
20 Donna Scott to present Mrs. Scott with a "for the record" on
21 February 5th, 2001?
22 A. I don't honestly recall being in that meeting.
23 Q. The meeting you're talking about was another meeting?
24 A. The meeting I'm talking about was a meeting that Donna had
25 with Connie Retherford and myself.

1  Q. And that was sometime -- or that was sometime after the
2  February 5th, 2001 meeting about the "for the record"?
3  A. It would have been after she had received the "for the
4  record."
5  Q. Do you know how long after that February 5th, 2001 meeting
6  your meeting with her was?
7  A. I don't recall.
8  Q. Could it have been as late as early March?
9  A. I guess that's possible. If the sequence of events was she
10 received the "for the record," she wrote a written response to
11 that, and then requested a meeting with Connie and myself, then
12 that meeting would have been subsequent to that and it would
13 have depended on when the request for the meeting took place
14 and when it could be scheduled.
15 Q. Okay. Tell me what was discussed in that meeting,
16 specifically what Mrs. Scott said that caused you some concern.
17 A. Well, the specific allegations about, you know, her
18 manager's dishonesty, her manager told the department to lie,
19 the manager had told Eddie to lie, and the allegation of
20 harassment and discrimination within the department.
21 Q. What about telling Eddie to lie? What were the facts of
22 that?
23 A. As I recall, Donna's allegation was that Becky had told
24 Eddie to lie, and that's all I recall her saying in the
25 meeting. In the follow-up investigation, I think, is where